## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ELENA COLES** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-0223 (RMC)** |
| | ) | |
| **DR. FRANCIS J. HARVEY** | ) | |
| **Secretary of the Army** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff, *pro se*, pursuant to Local Court Rule 7 and in opposition to Defendant's Motion to Dismiss or in the Alternative for Summary Judgment:

## I.    INTRODUCTION

### A.  Factual Background

In August of 2000, Ms. Coles was contacted by Charles Ansley, a Walter Reed Army Medical Center (hereinafter "WRAMC") employee, who inquired whether or not she would be interested in returning to the Infectious Disease Clinic (hereinafter "ID Clinic") for a receptionist position that was opening. (See Plaintiff's Exhibit "A")  After Ms. Coles indicated that she would be interested in the opening, Mr. Ansley told Ms. Coles that she was hired but that she had to fill out some paperwork with Kelly Services because they had been awarded the contract and was now administering the hiring by WRAMC. (See Plaintiff's Exhibit "A")  Mr. Ansley made it clear to Ms. Coles that she already had the job in the ID Clinic and that filling out the paperwork was just a formality. (See Plaintiff's Exhibit "A")  Mr. Ansley discussed Plaintiff's

RECEIVED

OCT 1 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

rate of pay and asked her how much she wanted to make. (See Plaintiff's Exhibit "A")  Mr. Ansley told Ms. Coles that he would start her in the high range because she had worked in the ID Clinic before and had done a good job. (See Plaintiff's Exhibit "A")  Mr. Ansley discussed Ms. Coles job duties and told her that she would be doing the same type of work as before. (See Plaintiff's Exhibit "A")  Mr. Ansley called Kelly Services and instructed that Ms. Coles be hired based on her prior work history at the ID Clinic. (See Plaintiff's Exhibit "A")  Kelly Services did not place Ms. Coles at the ID clinic rather, the ID Clinic hired Ms. Coles and instructed Kelly Services to make the placement after its employment decision regarding Ms. Coles had been made. (See Plaintiff's Exhibit "A")  Ms. Coles did not have an employment application at Kelly Services until after she was hired by the ID Clinic at WRAMC. (See Plaintiff's Exhibit "A")

On September 6, 2000, Ms. Coles reported to the ID Clinic after filling out paperwork at Kelly Services' on site office. (See Plaintiff's Exhibit "A")   As per Mr. Ansley's instructions, filling out the paperwork at Kelly Services was just a formality. (See Plaintiff's Exhibit "A")

In the ID Clinic, Ms. Coles was stationed at the front desk next to Nathaniel Peoples. (See Plaintiff's Exhibit "A")   Mr. Peoples was a receptionist and full-time federal government employee. (See Plaintiff's Exhibit "A")  Ms. Coles and Mr. Peoples' job duties were identical. Ms. Coles and Mr. Peoples' both reported directly to Ann DeSoto. (See Plaintiff's Exhibit "A") The job duties performed by Ms. Coles and Mr. Peoples were part of the normal operation of the ID Clinic and included greeting patients, scheduling appointments, assisting in record keeping, entering patient's laboratory results into the WRAMC computer system and answering the phone. (See Plaintiff's Exhibit "A")  Ms. Coles and Mr. Peoples' jobs did not require any special technical skill. (See Plaintiff's Exhibit "A")

Both Ms. Coles and Mr. Peoples' work schedules and hours were determined by WRAMC. (See Plaintiff's Exhibit "A")   Ann DeSoto and Charles Ansley assigned work duties to Ms. Coles and Mr. Peoples. (See Plaintiff's Exhibit "A")

On or about April 2001, Sgt. Gregory Lawrence was transferred to the ID Clinic in the position of Non-Commissioned Officer In Charge (hereinafter "NCOIC"). (See Plaintiff's Exhibit "A")   While Sgt. Lawrence was not Ms. Coles' direct supervisor, he did work in a position of authority at the ID Clinic. (See Plaintiff's Exhibit "A")   Ms. Coles job duties in the ID Clinic required direct contact with Sgt. Lawrence on a daily basis. (See Plaintiff's Exhibit "A")   Shortly after his assignment to the ID Clinic and on May 24, 2001, Sgt. Lawrence began to send Ms. Coles sexually explicit email during work hours from his government computer. (See Plaintiff's Exhibit "A")   In addition to sending the email, Sgt. Lawrence began to discuss his sexual activities including his participation in group sex parties and the fact that he and his male friends would solicit women for sex only. (See Plaintiff's Exhibit "A")   Sgt. Lawrence made it clear to Ms. Coles that he was not looking for a relationship, he just wanted to have sex with numerous women. (See Plaintiff's Exhibit "A")   It was Ms. Coles' understanding from these conversations that Sgt. Lawrence was interested in adding her to his numerous sexual conquests. (See Plaintiff's Exhibit "A")   Sgt. Lawrence used his position as the NCOIC as an opportunity to pursue his own sexual interests and perversions. (See Plaintiff's Exhibit "A") During the workday, Sgt. Lawrence would prowl Walter Reed for potential sexual conquests. (See Plaintiff's Exhibit "A")

Ms. Coles was not interested in having sexual relations with Sgt. Lawrence and told him not to send her sexually explicit email or to talk to her about his sexual conquests and his desire to have sex with large numbers of female partners around her. (See Plaintiff's Exhibit "A")

3

Despite Ms. Coles objections to Sgt. Lawrence's sexual advances, he continued to send her sexually explicit email and continued to discuss his other sexual conquests with her in hopes that she might give in. (See Plaintiff's Exhibit "A") Between May 24, 2001 and June 25, 2001, Sgt. Lawrence sent Ms. Coles between five and ten sexually explicit emails. Ms. Coles hoped that Sgt. Lawrence would get the message and stop. (See Plaintiff's Exhibit "A") Sgt. Lawrence never did get the message. (See Plaintiff's Exhibit "A")

At some point thereafter, Sgt. Lawrence stopped acting as if he wanted to have Ms. Coles become one of his sexual conquests and began directing threatening gestures towards her. (See Plaintiff's Exhibit "A") Sgt. Lawrence knew that his unwanted sexual advances towards Ms. Coles were inappropriate and feared that if Ms. Coles reported his behavior to his supervisors his career would be damaged. (See Plaintiff's Exhibit "A") Sgt. Lawrence began to regularly yell at Ms. Coles during the course of their work together and direct profanity towards her. (See Plaintiff's Exhibit "A") Sgt. Lawrence's behavior towards Ms. Coles became so hostile that it disturbed a patient who was at the clinic for treatment. (See Plaintiff's Exhibit "A")

Sgt. Lawrence further escalated his hostilities towards Ms. Coles beyond yelling and using profanity and began making physically threatening gestures (i.e. physically getting into Ms. Coles' face and acting as if he was going to hit her). (See Plaintiff's Exhibit "A") These violent gestures caused Ms. Coles to fear Sgt. Lawrence and have great concern for her safety while in the ID Clinic. (See Plaintiff's Exhibit "A") Sgt. Lawrence had access to needles contaminated with HIV and other infectious diseases and accidental needle pricks had occurred at WRAMC. (See Plaintiff's Exhibit "A")

On the evening of July 6, 2001, after her shift ended, Ms. Coles went to Charles Ansley and reported Sgt. Lawrence's sexual harassment and physically threatening hostilities towards her. (See Plaintiff's Exhibit "A")

On the evening of July 6, 2001, Ms. Coles spoke with Dr. Hawkes and told him about Sgt. Lawrence's sexual harassment and Dr. Hawkes told her that he wanted to have a meeting with Ms. Coles and Sgt. Lawrence to resolve the problem. (See Plaintiff's Exhibit "A")   Ms. Coles informed Dr. Hawkes about the sexual comments and emails. (See Plaintiff's Exhibit "A") Dr. Hawkes told Ms. Coles not to contact Kelly Services. (See Plaintiff's Exhibit "A")

On Sunday, July 8, 2001, Charles Ansley contacted Ms. Coles at her home and encouraged her not to write a statement or report Sgt. Lawrence's sexual harassment. (See Plaintiff's Exhibit "A")   Ms. Coles informed Mr. Ansley that she was afraid of Sgt. Lawrence. (See Plaintiff's Exhibit "A")

On Monday, July 9, 2001, Charles Ansley told Ms. Coles that she could have the day off. (See Plaintiff's Exhibit "A")

On Tuesday, July 10, 2001, Dr. Hawkes informed Ms. Coles that she had been terminated by Kelly Services because of a time card discrepancy. (See Plaintiff's Exhibit "A")   Ms. Coles noted to Dr. Hawkes that it was funny that after she made a complaint of sexual harassment that all of a sudden there was a time card discrepancy. (See Plaintiff's Exhibit "A")

On the evening of July 9, 2001, Charles Ansley again called Ms. Coles twice at her home to discuss why she had been terminated. (See Plaintiff's Exhibit "A")   Charles Ansley told Ms. Coles there was no time card discrepancy, but that she had insulted the ID Clinic by wanting to report sexual harassment to Kelly Services and make a formal complaint. (See Plaintiff's Exhibit

"A")    Mr. Ansley told Ms. Coles that she would not win, that it would be detrimental to her

career. (See Plaintiff's Exhibit "A")

Apparently, Ann DeSoto had contacted Kelly Services and informed its employees that

Ms. Coles had quit her job in the ID Clinic. (See Plaintiff's Exhibit "A")    This action was taken

in retaliation against Ms. Coles for reporting sexual harassment. (See Plaintiff's Exhibit "A")

On July 23, 2001, Ms. Coles filed a complaint with WRAMC internal EEO office. (See

Plaintiff's Exhibit "A")

On August 12, 2003, after intervention by Congressman Van Hollen's office, a hearing

was conducted by the Office of Complaint Investigations (OCI) and held at Walter Reed Army

Medical Center regarding Ms. Coles' complaint of sexual harassment and retaliation. (See

Plaintiff's Exhibit "A")

Ms. Coles' appealed the findings of the (OCI) to the EEOC. (See Plaintiff's Exhibit "A")

On or about 2004, Ms. Coles filed a defamation suit against Ann DeSoto as an individual

for her "sham" affidavit.  The Army transferred the complaint to the U.S. District Court for the

District of Columbia, named itself as a defendant and claimed sovereign immunity because Ann

DeSoto was acting within the scope of her employment when making the affidavit.  Because it

was Ms. Coles' understanding that Sovereign Immunity was an absolute defense to defamation,

Ms. Coles withdrew her my defamation Complaint. (See Plaintiff's Exhibit "A")

On November 15, 2005, Ms. Coles received her right to sue letter from the EEOC and

filed the current matter. (See Plaintiff's Exhibit "A")

Defendant Army had intentionally delayed its requisite EEO investigation process

thereby extending the time between Plaintiff reporting sexual harassment and exhausting all of

her administrative requirements to have standing to sue. (See Plaintiff's Exhibit "A")

6

Ms. Coles has never had the opportunity to vindicate her good name and work reputation

as a result of the actions taken by Defendant Department of the Army. (See Plaintiff's Exhibit

"A")   A Google search for "Elena Coles" now links to an opinion that states that Ms. Coles

falsified her time card, slapped a co-worker and was rude to patients although none of these

events ever occurred. (See Plaintiff's Exhibit "A")   Ms. Coles has suffered great

embarrassment, humiliation and emotional distress from the adverse employment actions of

Defendant Department of the Army. (See Plaintiff's Exhibit "A")   Additionally, Ms. Coles has

lost income and suffered professionally from the discrimination and retaliation by Defendant

Army through its employees and agents. (See Plaintiff's Exhibit "A")

## II.    ARGUMENT

### A. Legal Standards

#### 1) Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a complaint need only provide "'a short and plain statement of the claim' that will

give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it

rests." *Conley v. Gibson*, 355 U.S. 41, 47, (1957); *Stanford*, 394 F.Supp.2d 81, 86 (D.D.C.

2005). And when reviewing a motion to dismiss, the court must accept as true all the factual

allegations contained in the complaint. *Leatherman v. Tarrant County Narcotics Intelligence &*

*Coordination Unit*, 507 U.S. 163, 164 (1993); *Stanford,* 394 F.Supp.2d at 86. A motion to

dismiss under Rule 12(b)(6) tests not whether a plaintiff will ultimately prevail on the merits, but

only whether the plaintiff has properly stated a claim for which he is entitled to relief. *Woodruff*

*v. DiMario*, 197 F.R.D. 191, 193 (D.D.C. 2000); *Stanford*, 394 F.Supp.2d at 86. Thus, a

complaint should not be dismissed for failure to state a claim unless "it appears beyond a doubt

that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46; *Stanford*, 394 F.Supp.2d at 86 (D.D.C. 2005).

Where matters outside the pleadings are presented to the court in support of a motion to dismiss under Fed.R.Civ.P. 12(b)(6), such motion shall be treated as a motion for summary judgment and disposed of under Fed.R.Civ.P. 56. Fed.R.Civ.P. 12. *Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997); *Romero-Ostolaza v. Ridge*, 370 F.Supp.2d 139, 143 (D.D.C. 2005).

### 2) Motion for Summary Judgment

Summary judgment is appropriate when the motion papers, affidavits, and other submitted evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Romero-Ostolaza*, 370 F.Supp.2d at 143. Whether a fact is "material" is determined in light of the applicable substantive law invoked by the action. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In light of the applicable substantive law, a "genuine issue of material fact" is a fact that is determinative of a claim or defense, and therefore, affects the outcome of the case. *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248. The moving party bears the initial burden of demonstrating that genuine issues of material fact are in dispute. The Court is precluded from weighing evidence or finding disputed facts and must draw all inferences and resolve all doubts in favor of the non-moving party. *See Matushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

In the context of discrimination cases, summary judgment should be approached with special caution because of the difficulty in proving discriminatory intent. *Morgan v. Federal Home Loan Mortgage Corp.*, 172 F.Supp.2d 98, 104 (D.D.C. 2001); *See Ross v. Runyon*, 859 F.Supp. 15, 21-22 (D.D.C. 1994). If a reasonable factfinder could find discrimination, summary

judgment is inappropriate. *McCain v. CCA of Tennessee, Inc.*, 254 F.Supp.2d 115, 119 (D.D.C. 2003); *Hayes v. Shlala*, 902 F.Supp. 259, 264 (D.D.C. 1995).

### B. Plaintiff Has Adequately Stated Claims of Sexual Harassment and Retaliation

The plain language of Plaintiff's Complaint clearly state claims of sexual harassment and retaliation. If Plaintiff's claims are deficient in any manner she requests that this Honorable Court allow her leave to amend it.

### C. Plaintiff's Sexual Harassment and Retaliation Claims Are Not Barred by *Collateral Estoppel*

The objective of the doctrine of issue preclusion (also known as collateral estoppel) is judicial finality; it fulfills "the purpose for which civil courts had been established, the conclusive resolution of disputes within their jurisdiction." *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 467 (1982); *Yamaha Corp. of America v. U.S.*, 961 F.2d 245, 254 (D.C. Cir. 1992).

The standards for establishing the preclusive effect of a prior holding are: First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case. *See McLaughlin v. Bradlee*, 803 F.2d 1197, 1201 (D.C. Cir. 1986); *Yamaha Corp. of America*, 961 F.2d at 254 (D.C. Cir. 1992). Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination. An example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude. *See Otherson v. Department of Justice*, 711 F.2d 267, 273 (D.C. Cir. 1983); *see also Parklane Hoisery Co. v. Shore*, 439 U.S. 322, 330 (1979); *Yamaha*

*Corp. of America*, 961 F.2d at 254 (D.C. Cir. 1992). Fairness is a concern when addressing collateral estoppel especially when "prior proceedings were seriously defective."

In the instant case, Plaintiff had no opportunity to litigate her case before the trier of fact because summary judgment was granted to Kelly Services because of a "sham" affidavit by Defendant Department of the Army. Further, Plaintiff did not have an opportunity to engage in discovery because Defendant Department of the Army did not produce its "sham" affidavit until after the close of discovery in the Kelly case. As a result, not only did Plaintiff not get an opportunity to litigate the factual basis of the "sham" affidavit before a jury she did not get the opportunity to conduct discovery on WRAMC employees who had generated the "sham" affidavit.

Additionally, there was no need to litigate the issue of "joint employment" in the Kelly Services matter. Finally, because the Court granted summary judgment as a result of the "sham" affidavit by Department of the Army employees at WRAMC fairness precludes granting summary judgment for the Department of the Army now under the doctrine of *collateral estoppel*.

Finally, statutory provisions of Title VII required that Ms. Coles exhaust all of her administrative remedies before she had standing to sue Defendant Army, as a result Ms. Coles was limited in who she could name as a defendant until such time when she had standing to sue. In the instant case, that process was delayed by the Army's own EEO office delaying its investigation and hearing so long that Congressional intervention was required. After the hearing Ms. Coles promptly filed with in the EEOC and received her right to sue.

If Ms. Coles had not exhausted her administrative requirements, the basis of Defendant Army's motion for summary judgment would be "failure to exhaust administrative remedies."

### D. At The Close Of Discovery Plaintiff Will Be Able To Establish A Prima Facie Case of Sexual Harassment and Retaliation Against Defendant Department of the Army

#### 1) Ms. Coles was a "Joint Employee" of the Department of the Army and Kelly Services

While the Department of the Army has relied on the fact that Ms. Coles was not an

employee of the Department of the Army it has failed exhaust the realm of employment

possibilities such as "joint employment". While the Defendant relies on applying the factors of

*Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir. 1979) as discussed in *Redd v. Summers*, 232 F.3d

933 (D.C. Cir. 2000), a more appropriate analysis is that of *NLRB v. Browning-Ferris Indus. of*

*Pennsylvania*, 691 F.2d 1117 (3rd Cir. 1982). Whereby the standard formulation is whether "one

employer[,] while contracting in good faith with an otherwise independent company, has retained

for itself sufficient control of the terms and conditions of employment by the other employer."

*Redd v. Summers*, 232 F.3d 933, 938 (D.C. Cir. 2000).

The analysis in *NLRB v. Browning-Ferris* is not merely the Third Circuit's analysis, it is

a progeny of the Supreme Court's decision regarding the subject of "joint employer" in its *Boire*

*v. Greyhound Corp.*, 376 U.S. 473, opinion.

> The issue there, in part, was whether the Greyhound Corporation and
> Floors, an independent corporation unrelated to Greyhound, "share[d] or co-
> determine[d] those matters governing [the] essential terms and conditions of
> employment of the porters, janitors, and maids" Floor's employees working under
> contract in Greyhound facilities. *NLRB v. Greyhound Corp.*, 368 F.2d 778, 780
> (5th Cir. 1966) (on Remand from *Boire v. Greyhound Corp.*, 376 U.S. 473, 84
> S.Ct. 894, 11 L.Ed.2d 849 (1964) reversing *Biore v. Greyhound Corp.*, 309 F.2d
> 397 (5th Cir. 1962). In reversing the original Fifth Circuit opinion, the Supreme
> Court concluded that:

> Whether Greyhound, as the Board held, possessed sufficient control over
> the work of the employees to qualify as a joint employer with Floors is a question
> which is unaffected by any possible determination as to Floors' status as an
> independent contractor, since Greyhound has never suggested that the employees
> themselves occupy an independent contractor status. And whether Greyhound

11

possessed sufficient indicia of control to be an "employer" is essentially a factual issue.

*N.L.R.B v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117 (3rd Cir. 1982).

In the instant case it is clear that, the Department of the Army not only retained considerable control over Ms. Coles day to day work environment it actually exercised considerable control over the "means and manner" of Ms. Coles daily work activities. In fact, Department of the Army retained exclusive control over every aspect of the "means and manner" of Ms. Coles job duties. Therefore, a joint employment relationship can easily be established by Ms. Coles under this authority.

Even if this court were to apply a *Spirides* analysis as suggested by the Defendant, at least six of the 11 factors including: **factor 1**) kind of occupation, with reference to whether the work usually is done the direction of a supervisor or is done by a specialist without supervision; **factor 2**) the skill required in the particular occupation; **factor 3**) whether the "employer" or the individual in question furnishes the equipment used and the place of work; **factor 5**) the method of payment, whether by time or by the job; **factor 6**) the manner in which the work relationship is terminated; i.e., by one or by both parties, with or without notice and explanation; and **factor 8**) whether the work is an integral part of the business of the "employer" would support a finding that there was a joint employment arrangement between Department of the Army and Kelly Services.

Plaintiff can find no authority that states that retirement benefits and tax withholdings are super factors that contain more weight than other factors. Therefore, under the analysis of *Redd*, *supra*, Ms. Coles was jointly employed by Department of the Army and Kelly Services which is essentially a factual issue. *See Boire*, 376 U.S. at 481, *supra*.

**2) Genuine Issues of Material Fact Exist To Be Resolved by the Trier of Fact**

While there has not been discovery in this matter, genuine issues of material fact exist to be resolved by the trier of fact. As such, Ms. Coles should be afforded an opportunity to conduct discovery on the following and present them to the trier of fact.

1) Was Ms. Coles a "Joint Employee" of both the Department of the Army and Kelly Services?

2) Did Department of the Army retain enough control over the essential terms of Ms. Coles' employment to be deemed a "joint employer"?

3) Do unwanted sexually explicit emails from the NCOIC and suggestive conversations on more than 10 occasions about participating in group sex with Sgt. Lawrence and his buddies constitute sexual harassment under the circumstances presented in this case?

4) Does threats of physical violence from the NCOIC including acting as if he were going to punch Ms. Coles in her face after she rejected his sexual advances constitute creating a hostile work environment?

5) Did yelling profanities by the NCOIC on numerous occasions after Ms. Coles rejected sexual advances by the NCOIC constitute a hostile work environment?

6) When Ms. Coles became afraid to be around the NCOIC was her work environment hostile?

7) Did Ann DeSoto know that Ms. Coles had reported sexual harassment from her communications with Lt. Colonel Hawkes when she contacted Kelly Services and informed its employees that Ms. Coles had quit her job?

8) Were the actions by Ann DeSoto when she informed Kelly Services' that Ms. Coles' had quit after Ms. Coles' reported sexual harassment an adverse employment action?

9) Was the "sham" Affidavit by Ann DeSoto a "joint employment" activity calculated to retaliate against Ms. Coles for reporting sexual harassment?

10) Was Charles Ansley acting as a "joint employer" when he contacted Ms. Coles and warned her that WRAMC would ruin her career if she reported sexual harassment?

11) Did Ms. Coles quite her employment?

12) Did Defendant Department of the Army Retaliate against Ms. Coles for reporting sexual harassment and then try to ruin her career?

In addition to the above genuine issues, Lt. Colonel Hawkes, the head of the ID Clinic has stated under oath when viewing the sexually explicit emails that that Sgt. Lawrence sent to Ms. Coles, that Lawrence's actions constitute sexual harassment under the WRAMC EEO Guidelines. (See Plaintiff's Exhibit "B", EEO Deposition of Lt. Col. Hawkes; Plaintiff's Exhibit "C", Sexually Explicit Emails.)

Because there are genuine issues in dispute, summary judgment is not appropriate in this matter.

### 3) Defendant Department of Defense Cannot Provide This Court With A Legitimate Non Discriminatory Reason For Its Adverse Employment Actions Against Ms. Coles

Unlike Kelly Services, Inc. who used and benefited from Ann DeSoto's "sham" affidavit, Defendant Department of the Army will not be similarly situated in this action. To the contrary, WRAMC has no excuse for its adverse actions against Ms. Coles after she complained about sexual harassment.

14

**E. Equity Demands That The Defendant Department of the Army Be Denied Summary Judgment Because It Conspired With Kelly Services To Fabricate A Sham On This Court By Commanding Its Employee, Ann DeSoto, To Commit Perjury**

To allow Defendant Department of the Army to prevail at this stage of litigation with its motion for summary judgment would represent a manifest injustice against Ms. Coles and all future plaintiffs that may appear before this Honorable Court. Plaintiff can now establish with irrefutable evidence that Ann DeSoto's Affidavit to this Court was a sham and not based on personal knowledge. Further, Ms. DeSoto stated under oath that she did not write her Affidavit or participate in its drafting, she was called to the legal department and told to sign it without understanding what personal knowledge about the facts meant. (See Plaintiff's Exhibit "D".) Charles Ansley, Ann DeSoto's supervisor has stated under oath in his EEO deposition that, "there were no time card discrepancies." (See Plaintiff's Exhibit "E".) Lt. Colonel Hawkes has stated under oath that Ms. Coles' work performance was excellent. (See Plaintiff's Exhibit "B"; See also Plaintiff Exhibit "F") Lt. Colonel Hawkes Letter of Recommendation.)

As such, granting summary judgment to Defendant Department of the Army would be rewarding unlawful and unethical behavior.

Additionally, it would serve as a model to defendants on how to intentionally deceive this court during motions for summary judgment. While the sham affidavit in this case represents a crime of perjury and unethical violations on the part of all that participated, there were no adequate safeguards that prevent its use by Kelly Services. The position of the Department of the Army in this action is different, however. The Department of the Army should not and must not be allowed to benefit from its own bad deeds when assisting Kelly Services' in its motion for summary judgment. Therefore, supporting the Department of the Army's motion based on the fact that Kelly Services' motion was granted would result in a manifest injustice.

## III.    CONCLUSION

WHEREFORE for the above stated reasons, Plaintiff asks this court to deny Defendant

Department of the Army's motion to dismiss / motion for summary judgment and allow this

matter to go into discovery and ultimately to trial before a jury.

Respectfully submitted,


_Elena Coles_
Elena Coles
10118 Campus Way South, #203
Upper Marlboro, MD  20774
(301) 336-1894
*pro se*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed first-class, postage prepaid, this

_10th_ day of October, 2006 to:

    Kevin K. Robitaille
    Special Assistant U.S. Attorney
    Civil Division
    555 Fourth Street, N.W.
    Washington, D.C.  20530

_Elena Coles_
Elena Coles

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ELENA COLES** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 06-0223 (RMC)** |
| | ) | |
| **DR. FRANCIS J. HARVEY** | ) | |
| **Secretary of the Army** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES

Pursuant to LCvR 7(h) and in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Plaintiff respectfully submits this statement of genuine issues necessary to be litigated.

1. Plaintiff was a "joint employee" of Walter Reed Army Medical Center and Kelly Services.

2. Plaintiff was contacted by Charles Ansley, the Health Systems Specialist in the Infectious Disease Clinic ("ID Clinic") at WRAMC, on or about August of 2001 about an employment opportunity as a receptionist in the Infectious Disease Clinic ("ID Clinic") that existed at WRAMC.

3. Mr. Ansley told Plaintiff that he was hiring her for the receptionist position, but that she had to fill out some paperwork at Kelly Services because Kelly Services had been awarded the contract and was now administering the hiring by WRAMC.

4. Mr. Ansley made it clear to Plaintiff that she already had the job in the ID Clinic and that filling out the paperwork was just a formality.

5. Mr. Ansley discussed Plaintiff's rate of pay and asked her how much she wanted to make.

6. Mr. Ansley told Plaintiff that he would start her in the high range because she had worked in the ID Clinic before and had done a good job.

7. Mr. Ansley discussed Plaintiff's job duties and told her that she would be doing the same type of work as before.

8. Prior to Mr. Ansley telling Plaintiff that she had to fill out paperwork at Kelly Services, she did not know that WRAMC used Kelly Services for its employment needs.

9. Plaintiff was already hired by WRAMC at the time she contacted Kelly Services and Kelly Services did not place Plaintiff at the WRAMC.

10. Plaintiff never worked with Kelly Services prior to this joint employment.

11. The work Plaintiff performed at WRAMC was the same as the other receptionist in the ID Clinic.

12. The other receptionist, Nathaniel Peoples, was a full time federal government employee.

13. Plaintiff's job duties were identical to those of Mr. Peoples.

14. Both Plaintiff and Mr. Peoples were directly supervised by Ann DeSoto a WRAMC employee.

15. Plaintiff's job did not require any special technical skill and all of Plaintiff's work was performed on WRAMC equipment, using WRAMC procedures.

16. On my Plaintiff's first day of work, she reported directly to the ID Clinic and then went to the Kelly Services managers to fill out her paperwork.

17. All of Plaintiff's job duties were part of the normal operation of the ID Clinic. For example, Plaintiff greeted patients, scheduled appointments, assisted in record keeping, entered patient's laboratory test results into WRAMC computer system and I answered the phone.

18. Plaintiff's work schedule and hours were determined by WRAMC.

19. Plaintiff's work assignments were given to her on a daily basis by Ann DeSoto and Charles Ansley.

20. Sgt. Gregory Lawrence would oversee Plaintiff's job activities as the Non-Commissioned Officer In Charge of the ID Clinic.

21. Plaintiff never received a work assignment from a Kelly Services employee.

22. Plaintiff was never reimbursed for work related expenses by Kelly Services.

23. Kelly Services employees worked in Building 1 and not Building 2 where the ID Clinic was located.

24. Plaintiff had no communications with the Kelly Services management other than when she filled out the paperwork on her first day and when she reported sexual harassment on her last day.

25. Plaintiff turned in her time card in a box located on a door in Building 1.

26. The Kelly Services employees were site managers who never worked in the ID Clinic.

27. The Kelly Services managers did not give work assignments in the ID Clinic.

28. Kelly Services managers were not authorized by WRAMC to give assignments in the ID Clinic.

29. The Army paid Kelly Services and Kelly Services paid Plaintiff from that money.

30. Under Plaintiff's joint employment arrangement, WRAMC reserved the right to terminate her.

31. Charles Ansley called Plaintiff at her home and informed her that she was terminated because she offended the clinic by reporting sexual harassment.

32. WRAMC had the actual authority to and actually did contact Plaintiff and terminate her directly without the intervention of Kelly Services' management.

3

33. Mr. Ansley further communicated to Plaintiff that it was useless for her to try to fight her termination because WRAMC would ruin her life.

34. No Kelly Services employee contacted Plaintiff about her employment status before Charles Ansley informed Plaintiff she had been terminated.

35. Ann DeSoto contacted Kelly Services and told them that Ms. Coles had "quit" after Charles Ansley, Ann DeSoto's supervisor, had informed Ms. Coles that she had been terminated by WRAMC.

36. WRAMC instructed Kelly Services to change Plaintiff's employment status in their computer system after Plaintiff reported sexual harassment.

37. WRAMC had policies that prohibited sexual harassment against all of its employees including government, military and contract employees.

38. Because Plaintiff was jointly employed, she filed complaints with the EEOC against both WRAMC and Kelly Services.

39. Because WRAMC was a government agency it took Plaintiff longer to complete her mandatory administrative requirements and receive her right to sue under Title VII.

40. The EEOC understood Plaintiff's joint employment status when it issued her right to sue letter against the WRAMC.

41. WRAMC and Kelly Services worked together as joint employers to fabricate a "sham" Affidavit by Ann DeSoto stating that Plaintiff had been rude to patients, slapped a coworker's hand and falsified her time card, which resulted in Summary Judgment being granted for Kelly Services by this Honorable Court.

42. None of the statements about Plaintiff's employment activities were true.

43. WRAMC and Kelly Services coordinated efforts to end Ms. Cole's litigation against Kelly Services demonstrate a joint employment arrangement.

44. Ann DeSoto did not act alone and was instructed by WRAMC attorneys to perjure herself in the affidavit presented to this Court in support of Kelly Services Motion for Summary Judgment.

45. Sgt. Gregory Lawrence sent Plaintiff sexually explicit emails from his WRAMC government computer.

46. Plaintiff told Sgt. Gregory Lawrence not to send him sexually explicit material but Sgt. Gregory Lawrence continued.

47. In addition to sending Plaintiff sexually explicit emails, Sgt. Lawrence had conversations about his sexual conquests around Plaintiff to see if she were interested in having a relationship with him.

48. When Plaintiff did not reciprocate Sgt. Lawrence's advances he became openly hostile towards her.

49. On more than one occasion he held his arm back and acted like he was going to hit Plaintiff.

50. Plaintiff reported Sgt. Lawrence's behavior to WRAMC and Kelly Services, after all attempts to stop the hostilities failed.

51. Plaintiff did not quite her job.

52. Ann DeSoto was aware that Plaintiff had reported sexual harassment when she contacted Kelly Services and had Plaintiff terminated.

Respectfully submitted,

Elena Coles
10118 Campus Way South, #203
Upper Marlboro, MD  20774
(301) 336-1894
*pro se*