IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELENA COLES )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DR. FRANCIS J. HARVEY )<br>Secretary of the Army )<br>)<br>Defendant. )<br>_____) | Civil Action No. 06-0223 (RMC) |

## AFFIDAVIT OF ELENA COLES

I hereby make the following statements under the penalty of perjury based on my personal knowledge and belief:

1. I am over 18 years of age.

2. In August of 2000, I was contacted by Charles Ansley, a Walter Reed Army Medical Center (hereinafter "WRAMC") employee, who inquired whether or not I would be interested in returning to the Infectious Disease Clinic (hereinafter "ID Clinic") for a receptionist position that was opening.

3. After I indicated that I would be interested in the opening, Ms. Ansley told me that I was hired but that I had to fill out some paperwork with Kelly Services because they had been awarded the contract and was now administering the hiring by WRAMC.

4. Mr. Ansley made it clear to me that I already had the job in the ID Clinic and that filling out the paperwork was just a formality.

5. Ms. Ansley discussed my rate of pay and asked me how much I wanted to make.

PLAINTIFF'S EXHIBIT "A"

6. Mr. Ansley told me that he would start me in the high range because I had worked in the ID Clinic before and had done a good job.

7. Mr. Ansley told me that I would be doing the same types of things that I did before.

8. Mr. Ansley called Kelly Services and instructed Kelly Services to hire me based on my prior work history at the ID Clinic.

9. Kelly Services did not place me at the ID clinic rather, the ID Clinic hired me and instructed Kelly Services to make the placement after WRAMC's employment decision had been made.

10. I did not have an employment application at Kelly Services until after I was hired by the ID Clinic at WRAMC.

11. On September 6, 2000, I reported to the ID Clinic after filling out paperwork at Kelly Services' on site office.

12. As per Mr. Ansley's instructions, filling out the paperwork at Kelly Services was just a formality.

13. I was stationed at the front desk next to Mr. Peoples in the ID Clinic.

14. Mr. Peoples was a receptionist and full-time federal government employee.

15. Mr. Peoples and my job duties were identical.

16. We both reported directly to Ann DeSoto.

17. The job duties we performed as receptionist were a part of the normal operation of the ID Clinic and included greeting patients, scheduling appointments, assisting in record keeping, entering patient's laboratory results in the WRAMC computer system and answering the phone.

18. Our jobs as receptionists did not require any special technical skill.

19. Both of our work schedules and hours were determined by WRAMC.

20. Ann DeSoto and Charles Ansley assigned work duties to both Mr. Peoples and me.

21. On or about April 2001, Sgt. Gregory Lawrence was transferred to the ID Clinic in the position of Non-Commissioned Officer In Charge (hereinafter "NCOIC").

22. Sgt. Lawrence was not my direct supervisor, he did work in a position of authority at the ID Clinic.

23. My job duties in the ID Clinic required direct contact with Sgt. Lawrence on a daily basis.

24. Shortly after his assignment to the ID Clinic and on May 24, 2001, Sgt. Lawrence began to send me sexually explicit email during work hours from his government computer.

25. In addition to sending the email, Sgt. Lawrence began to discuss his sexual activities including his participation in group sex parties and the fact that he and his male friends would solicit women for sex only.

26. Sgt. Lawrence made it clear to me that he was not looking for a relationship, he just wanted to have sex with numerous women.

27. I found Sgt. Lawrence to be a disgusting human being.

28. It was my understanding from these conversations that Sgt. Lawrence was interested in adding me to his numerous sexual conquests.

29. Sgt. Lawrence used his position as the NCOIC as an opportunity to pursue his own sexual interests and perversions. During the workday, Sgt. Lawrence would prowl Walter Reed for potential sexual conquests.

30. I was not interested in having sexual relations with Sgt. Lawrence and I told him not to send me sexually explicit email or to talk to me about his sexual conquests and desire to have sex with large numbers of female partners.

31. Despite my objections to Sgt. Lawrence's sexual advances, he continued to send me sexually explicit email and continued to discuss his other sexual conquest with me in hopes that I might give in.

32. Between May 24, 2001 and June 25, 2001, Sgt. Lawrence sent me between five and ten sexually explicit emails.

33. I hoped that Sgt. Lawrence would get the message and stop.

34. Sgt. Lawrence never did get the message.

35. As some point after that, Sgt. Lawrence stopped acting as if he wanted to have sex with me and began directing threatening gestures towards me.

36. Sgt. Lawrence knew that his unwanted sexual advances towards me were inappropriate and feared that if I reported his behavior to his supervisors his career would be damaged.

37. Sgt. Lawrence began to regularly yell at me during the course of our work together and directed profanity towards me.

38. Sgt. Lawrence's behavior towards me became so hostile that it disturbed a patient who was at the clinic for treatment.

39. Sgt. Lawrence further escalated his hostilities towards me beyond yelling and using profanity and began making physically threatening gesture (i.e. physically getting into my face and acting like he was going to hit me).

40. These violent gestures caused me to fear Sgt. Lawrence and have great concern for her safety while in the ID Clinic.

41. Sgt. Lawrence had access to needles contaminated with HIV and other infectious diseases and accidental needle pricks had occurred at WRAMC.

4

42. On the evening of July 6, 2001, after my shift ended, I went to Charles Ansley and reported Sgt. Lawrence's sexual harassment and physically threatening hostilities towards me.

43. On the evening of July 6, 2001, I spoke with Lt. Colonel Hawkes the chief of the clinic and told him about Sgt. Lawrence's sexual harassment and Dr. Hawkes told me that he wanted to have a meeting with Sgt. Lawrence to resolve the problem.

44. I informed Dr. Hawkes about the sexual comments and emails.

45. Dr. Hawkes told me not to contact Kelly Services.

46. On Sunday, July 8, 2001, Charles Ansley contacted me at my home and encouraged me not to write a statement or report Sgt. Lawrence's sexual harassment.

47. I informed Mr. Ansley that I was afraid of Sgt. Lawrence.

48. On Monday, July 9, 2001, Charles Ansley told me that I could take the day off.

49. On Tuesday, July 10, 2001, Dr. Hawkes informed me that I had been terminated by Kelly Services because of a time card discrepancy.

50. I noted to Dr. Hawkes that it was funny that after I made a complaint of sexual harassment that all of a sudden there was a time card discrepancy.

51. On the evening of July 9, 2001, Charles Ansley again called me twice at my home to discuss why I had been terminated.

52. Mr. Ansley told me that there was no time card discrepancy, but that I had insulted the ID Clinic by wanting to report sexual harassment to Kelly Services and make a formal complaint.

53. Mr. Ansley told me that I would not win and that it would be detrimental to my career.

54. I later learned that Ann DeSoto had contacted Kelly Services and informed its employees that I had quit my job in the ID Clinic.

55. This action was taken in retaliation against me by Ann DeSoto for reporting sexual harassment.

56. On or about July 23, 2001, I filed a complaint with WRAMC inter EEO office.

57. On August 12, 2003, after intervention by Congressman Van Hollen's office, a hearing was conducted by the office of Complaint Investigations (OCI) and held at WRAMC regarding my complaint of sexual harassment and retaliation.

58. I appealed the findings of the (OCI) to the EEOC.

59. On or about 2004, I filed a defamation suit against Ann DeSoto as an individual for her "sham" affidavit.

60. The Department of the Army transferred the complaint to the U.S. District Court for the District of Columbia, named itself as a defendant and claimed sovereign immunity because Ann DeSoto was acting within the scope of her employment when making the affidavit.

61. Because it was my understanding that sovereign immunity was an absolute defense to defamation, I withdrew my defamation Complaint.

62. On November 15, 2005, I received my right to sue letter from the EEOC and filed the current matter.

63. Defendant Army had intentionally delayed its requisite EEO investigation process thereby extending the time between my reporting sexual harassment and exhausting all of my administrative requirements to have standing to sue.

64. I have never had the opportunity to vindicate my name and work reputation.

65. A Google search for "Elena Coles" now links to an opinion that states that I falsified my time card, slapped a co-worker and was rude to patients although none of these events ever occurred.

66. As a result, I suffered great embarrassment, humiliation and emotional distress from the adverse employment actions of Defendant Army.

67. Additionally, I lost income and suffered professionally from the discrimination and retaliation by Defendant Army through its employees and agents.

                                                       Respectfully submitted,

                                                       */s/ Elena Coles*
Elena Coles
10118 Campus Way South, #203
Upper Marlboro, MD  20774
(301) 336-1894
*pro se*